

**Dated: February 18, 2011 11:24:55**

**The following is ORDERED:**

T.M. Weaver
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF OKLAHOMA**

IN RE:                               )
                                     )   CASE NO. 10-13528-WV
MILLENNIUM MULTIPLE EMPLOYER         )
WELFARE BENEFIT PLAN,                )      Chapter 11
                                     )
              Debtor.                )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATING TO**
**ORDER DENYING JOINT MOTION FOR APPROVAL OF SETTLEMENT**

On February 7, 2011, the court announced in open court its ruling on the Joint Motion for Approval of Settlement [Dkt. #487]. On February 8, 2011, the court entered its Order Denying Joint Motion for Approval of Settlement [Dkt. #897], referring in the order to the reasons for the ruling stated on the record in open court.

Due to problems with the transcription of the February 7, 2011, announcement, however, the court entered its order of February 11, 2011 [Dkt. #912], notifying the parties that the court would enter a written order reflecting the court's findings of fact and conclusions of law made in connection with its ruling. Accordingly, the following shall

constitute the court's findings of fact and conclusions of law, pursuant to Bankruptcy Rule 7052, that form the bases for its Order Denying Joint Motion for Approval of Settlement.

Findings of Fact

The Joint Motion for Approval of Settlement (Dkt. #487) was filed by the Debtor and the Official Committee of Unsecured Creditors. The hearing on the motion was held on December 16, 17 and 20, 2010. At the conclusion of the hearing, the Court requested proposed findings of fact to be submitted by the parties. Those findings were submitted.

On June 9, 2010, ("petition date"), Millennium Multiple Employer Welfare Benefit Plan, (the "Debtor"), filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor is now, and has been since its filing of the Chapter 11 petition, in possession of its assets and it has been operating as debtor-in-possession.

The Debtor's Multiple Employer Welfare Benefit Plan provides certain lifetime benefits, such as medical benefits, as well as death benefits for Eligible Employees. "Eligible Employees" are also referred to throughout this order as "participants." Eligible Employees are employed by those who have chosen to participate in the Plan, and those are called "Covered Employers."

Benefits for participants, that is, Eligible Employees, are funded by contributions made to the Plan by the Covered Employers. Contributions made to the Plan by the Covered Employers are used by the Plan to purchase life insurance policies on the lives of participants for whom the contributions are made.

The life insurance policies constitute almost all of the assets of the Debtor. All assets of the Plan are held in Trust, a requirement of ERISA (29 U.S.C. section 1102, *et*

2

*seq.*)

The legal owner of all life insurance policies held by the Plan is Republic Bank & Trust, as Trustee.  The beneficiary of all of the policies is the Debtor.  As noted, the insureds of the policies are the respective participants.

Documents governing the Plan and its operation are the Master Plan, the Trust Agreement, and the Adoption Agreement.   All of those documents were admitted in evidence at the hearing.  The Master Plan provides that the Plan is a "10 or More Employer Welfare Benefit Plan," under Internal Revenue Code § 419 A (f)(6) and applicable ERISA provisions.

Benefits for non-owner participants are protected by ERISA.  Under the Plan Documents and the requirements for a 10 or more Employer Welfare Benefit Plan under Internal Revenue Code § 419 A (f)(6), the life insurance policies held by the Plan are held for the collective benefit of all participants in the Plan.  An individual participant is neither the legal owner of the policy insuring that participant's life (as noted, the Trustee is the legal owner), nor the beneficiary of the policy (also as noted,  the Plan is the beneficiary) and the participant has no ownership interest in the policy on his or her life.  The policies are pooled for the benefit of all participants and their beneficiaries.

The participant is entitled to benefits provided under the Plan,  not under the insurance policy on the participant's life.  Thus, the Plan may fund the payment of those benefits from any of the life insurance policies it holds, regardless of  whose life is insured by the policy.

The Debtor, and previously the Plan, funds the payment of benefits, and its operations, by borrowing against the cash surrender values of the policies it holds.  Thus,

for example, benefits paid by the Debtor to participant "A" could be funded by a loan against the cash surrender value of a policy on the life of participant "B".

A plan qualified under § 419 A (f)(6) may not render an individual accounting to its participants; that is, it may not treat a life insurance policy on the life of a participant as if the participant were the owner of the policy or as if the policy were held for the account of that participant.  And while, on the death of a participant the Plan would intend to use the death benefit paid to it as beneficiary of the policy as funding for whatever death benefit the Plan had agreed to pay the participant's beneficiary under the Plan, the Plan is obligated to pay the participant's beneficiary regardless of whether the insurance company pays a death benefit to the Plan.  This finding, or perhaps conclusion, is consistent with the testimony of the Plan Manager, Jonathan Cocks.

Insurers of the policies held by the Plan, now Debtor, include Aviva, American General, Penn Mutual, Phoenix Life and others.  The Debtor holds approximately 450 policies with a total accumulated value (that is,  cash surrender value) of approximately $130,000,000, subject to policy loans of roughly $30,000,000.

At the time of the hearing, there were approximately 225 Covered Employers, and about 425 participants.  The Debtor has listed the Covered Employers and participants as unsecured creditors in its bankruptcy schedules.

Proofs of Claim have been filed by many of the Covered Employers and participants.  These Covered Employers and participants who have brought suit against the Debtor, as later discussed,  did not file Proofs of Claim.

On the petition date, there was extensive litigation pending against the Debtor.  A significant number of current and former Covered Employers and participants (collectively,

4

the "Litigation Claimants") had brought suit against the Debtor and others in state courts in several states.  There are a total of seven such cases.  In what are referred to as the Young and Westfall cases alone, there are about 90 plaintiffs.  Other defendants in the cases include the insurers of the policies, Aviva, American General, and others.  Also, agents of the insurance companies are named as defendants in the litigation.

The lawsuits all assert similar claims; that is, that the Litigation Claimants' participation in the Plan was induced by fraud and misrepresentation on the part of the Debtor, the insurance companies, agents and others.  The allegations relate to purported representations that the Plan was qualified under section 419 A (f)(6) as a ten or more Employer Welfare Benefit Plan; and, thus, contributions made to the Plan would be tax deductible.  The Plan was not so qualified and the contributions were not deductible, the plaintiffs allege.  The plaintiffs assert that the Plan was merely a scheme to sell insurance, a fact which was not disclosed to the plaintiffs.

Related to the fraud claims are plaintiffs' claims of negligent representation, fraudulent inducement, constructive trust, civil conspiracy, state statutory claims, and breach of fiduciary duty.  The plaintiffs seek to recover the premiums paid on the policies. And some plaintiffs also seek the imposition of a constructive trust so that the participants would become the owners of the policies.  The financial exposure to the Debtor of the litigation could be as much as $150,000,000.

Mr. Cocks, Plan Manager, testified without refute that the Debtor is solvent, having approximately $80,000,000 in net assets.  This does not take into account any potential liability of the Debtor to the Litigation Claimants.

The Debtor has spent an estimated $6,000,000 in defense of this litigation, and in

the interpleader litigation brought by Aviva and American General.  The Debtor has exhausted its liability insurance coverage.  All of the litigation has been stayed by the bankruptcy filing.  The stay has not been lifted.

Pre-petition, the insurers filed interpleader litigation in the Federal District Court for the Western District of Oklahoma, based on assertions that there were competing claims to the policies being asserted by the Debtor and the Litigation Claimants.  There are cross-claims and third party claims asserted against the Debtor.  Post-petition, adversary proceedings in interpleader have been filed in this bankruptcy court.

The Debtor and the Committee have negotiated a settlement of the claims of the Litigation Claimants, which, of course, is the subject of the Joint Motion ( the "9019 Motion") seeking the approval of the settlement.  A copy of the Settlement Agreement was attached to the Joint Motion introduced as  Joint Movant's Exhibit No. 19 at the hearing.

Notice of the hearing was served on some, but not all of the creditors.  See Docket No. 501.  The Settlement Agreement was not attached to the notice.  The Settlement Agreement was not served on all creditors.

The notice contained a purported summary of the material terms of the Settlement. The essential terms of the Settlement are:

1. All life insurance policies on the lives of the Litigation Claimants would be surrendered or liquidated.

2.  From the proceeds of the surrender or liquidation of the policies, $3,000,000 would be set aside as a "Settlement repayment."  That sum would be held by the Debtor or by what is called in the Agreement as the Millennium Liquidation Trust.

3.   The remaining cash proceeds (that is, the liquidation proceeds less the

6

$3,000,000 Settlement repayment) would be paid to counsel for the Litigation Claimants' beneficiaries.   The Litigation Claimants' beneficiaries are defined in the Settlement Agreement as being the Litigation Claimants who are participants.    Then such counsel is to make a pro rata distribution to the Litigation Claimants' beneficiaries based on the relative contributions that have been made to the Plan.

4.   The Litigation Claimants are to dismiss all litigation against the Debtor, and mutual releases are to be exchanged between them. The other parties to the litigation are not to be released.   The Litigation Claimants are to give a limited release of Plan Committee members, Republic Bank & Trust, the Committee (meaning the Unsecured Creditors Committee),  the Millennium Liquidation Trust and others for acts or omissions that are required or consistent with the terms of the Settlement Agreement.

5.    20 percent of any settlement that may be made in the future between the Litigation Claimants and third-party defendants is to go to the Millennium Liquidation Trust, unless the Litigation Claimants and the Trust agree to a different allocation.

The parties filing joinders in support of the settlement motion are the Litigation Claimants,  and certain Non-Litigants, Covered Employers, Mission Ranch, et al. (Docket No.  701).

Objecting to the Settlement are Aviva (Docket No. 584), American General (Docket No. 588), Penn Mutual (Docket No. 594), Phoenix Life (Docket No. 598), Benjamin David Kennedy II and others (Docket No. 613), David Cline (Docket No. 640),  C & G Creditors, (Docket No. 592 and No. 608), and Grant Thornton (Docket No. 606).

Objections to the Settlement were extensive, including   contentions that the Settlement was a *sub rosa* plan of reorganization, that it was not fair and equitable, that

the Settlement was contrary to the terms of the Plan and would jeopardize its qualification under Section 419 A (f)(6), causing harm to the Non-Litigation Participants, that the Settlement violated ERISA provisions, that it attempted to bind the Millennium Liquidation Trust, which did not exist, that the Settlement was based in part on the expectation of a favorable settlement with the IRS on the section 419 A (f)(6) qualification issue, but the Settlement had not yet occurred, that the Settlement terms were vague and uncertain in material respects, among other objections.

Testifying in support of the Settlement were Jonathan Cocks, Plan Manager, and Lester Lewis, a member of the Committee and a Non-Litigation Participant. John Malesovas, a member of the Committee and counsel for some of the Litigation Claimants was called as a witness by Aviva. Evidence at the hearing established that the negotiation of the Settlement was handled by the Committee with the Debtor's involvement being very limited. Dr. Lester Lewis, a participant, who was not involved in any of the litigation against the Debtor, was Co-Chair of the seven person Committee. The other Co-Chair was John Malesovas. Dr. Lewis testified that during the negotiations he believed there were four members of the Committee who were Litigation Claimants or their counsel, and three who were Non-Litigation Participants, but that only recently had he learned that there were, indeed, only two Non-Litigation Participants on the Committee.

Dr. Lewis saw his role as one of representing the interests of those participants who did not want to litigate. He and Committee counsel, Mr. Kiran Phansalkar, negotiated the terms of the Settlement with Mr. Anthony Vitullo, who was counsel for some Litigation Claimants, but was not himself a Committee member.

It is undisputed that the cash surrender value of the policies insuring the lives of the

8

Litigation Claimants who are participants, less policy loans, (i.e., the net accumulated value) is approximately 29 percent of the net accumulated value of all policies on the lives of all participants. Thus, the net accumulated value of the policies on the lives of the Non-Litigation Participants is about 71% of the value of all policies.

Because loans against the policies on the lives of the Litigation Claimant participants were disproportionately lower than loans against the rest of the policies, an adjustment was made in the calculation of what the Litigation Claimants would receive. This adjustment, or "true-up", as Mr. Cocks, called it, was approximately 2.5 million dollars. Thus, the amount that the Litigation Claimants would receive was reduced by this adjustment figure of $2.5 million. This adjustment is part of the $3,000,000 Settlement repayment.

After consummation of the Settlement, payment of future administration expenses would be the responsibility of the Non-Litigation Participants. Cocks estimated that future administration expenses would be in the neighborhood of $6 to $8 million. Lewis estimated the figure at $4.5 to $5 million. Lewis testified that he obtained his estimate from Committee counsel and the estimate was confirmed by Debtor's counsel.

Funds available for payment of future administration expenses would come from approximately $500,000 of the $3,000,000 Settlement repayment, from available cash on hand, which Cocks estimated to be $500,000 to $600,000, from refundable attorney retainers, in an unknown amount (originally, the retainers were about a million dollars) and from any sums received from the 20 percent of any settlement between the Litigation Claimants and third-party defendants. Totaling those amounts - from the Settlement repayment of $500,000, and from available cash of $500,000 to $600,000, there would be $1 million to $1.1 million in available funds. Refundable portions of attorney fee retainers

9

is an uncertain amount, as is any sum that might be received pursuant to the 20 percent of any settlement between the Litigation Claimants and third-party defendants.

There was no evidence at the hearing of any other source of funds that would be available for payment of future administration expenses, and no one disputes that such payment would be the responsibility of the Non-Litigation Participants under the proposed Settlement.

The IRS has taken the position that the Plan is not qualified under § 419 A (f)(6). There have been some court rulings adopting the position of the IRS. Mr. Cocks testified that there were currently ongoing negotiations with the IRS that he believed would be resolved soon, and favorably to the Debtor, regarding the Plan's qualification. But at the time of the hearing there had been no Settlement reached.

With regard to the merits of the claims of the Litigation Claimants, Cocks opined that the claims were frivolous and without merit because the Plan was not involved in the marketing of the product. As earlier noted, the claims involved alleged representations made with respect to inducements to participate in the Plan.

Lewis did not offer an opinion on the merits of the Litigation Claimants' claims. His expressed concern was with getting rid of the litigation as soon as possible so the Debtor could move forward with a liquidation plan. For Lewis, the Settlement would also do away with the necessity of the Debtor's defending the Litigation Claimants' motion to dismiss and for the appointment of a trustee.

Lewis thought the Settlement was fair to the Non-Litigation Participants, and that they stood to gain from the provision entitling them to 20 percent of any settlement with third-party defendants - a benefit they could not count on under a plan of reorganization.

10

The Plan Documents contain no provision for payment to any participant of the cash surrender value of the policy on the participant's life.  The Master Plan, Joint Exhibit No. 1, provides in section 8.02 (c), that on the termination of the Plan, participants would be entitled to receive that fixed benefit determined by their Rating Group and their duration of participation in the Plan.

Regarding issues of whether the Settlement would be contrary to or in violation of the qualification provisions of I.R.C. Section 419 A (f)(6) or ERISA; and, thus, create tax liability and other financial exposure to the Non-Litigation Participants, Lewis testified that tax counsel, Adria Price, had advised the Committee that there would be no adverse tax consequences to the Non-Litigation Participants.  However,  no written opinion was provided to the Committee by Ms. Price.  Ms. Price was then  representing a Covered Employer, Mr. Williams, in litigation against the IRS regarding the same issue of qualification under section 419 A (f)(6).  Lewis  recalled that an ERISA attorney had advised the Committee that there would be no ERISA violations concerning the Settlement; but the attorney did not furnish the Committee with a written opinion.  Lewis did not remember the ERISA attorney's name.

Cocks testified that the Committee, not the Debtor, dealt with the  tax and  ERISA issues with regard to the Settlement.  Cocks said that the Debtor has received no opinion of counsel that the Plan would remain compliant under 419 A (f)(6) after the Settlement.

The seven members of The Committee unanimously approved the Settlement. The net effect of the Settlement is that the Litigation Claimants will receive somewhere between $24 million and $25 million after the reduction for the $3 million Settlement repayment.

11

According to Cocks, the net value of the Debtor's assets was approximately $80,000,000.  While the cash surrender value of all policies, less policy loans, is approximately $100 million, the liquidation value of the Debtor's assets would be reduced substantially by surrender charges that must be paid upon surrender or liquidation of the policies.

The Settlement  will not resolve all litigation involving the Debtor. The insurance companies will not voluntarily allow the liquidation of the policies.  There are also indemnity claims against the Debtor.

There have been over 3.8 million dollars of professional fees and expenses allowed in the bankruptcy case through November of 2010.

Cocks testified that the Debtor intended to file a liquidating plan of reorganization to address the claims of the rest of the creditors.  It was undisputed that the Litigation Claimants, the Non-Litigation Participants and the insurance companies are all unsecured creditors.

Lewis acknowledged that the Non-Litigation Participants will bear the risk of the Settlement.  Lewis expressed to the Committee his desire that an auditor or accountant be engaged to check the Settlement calculations.  But he was out voted because of concerns regarding the time and expense that that would involve.  Lewis said he felt pressure under the circumstances because if more time would  elapse in reaching the Settlement, there would be more expense.

<u>Applicable Law</u>

Rule 9019(a) of the Bankruptcy Rules provides:  "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."     *Id*.

12

Compromises are favored in bankruptcy. *Korngold v. Loyd (In re Southern Medical Arts Co., Inc.)*, 343 B.R. 250, 255 (10th Cir. BAP 2006). The purpose behind compromises "is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Id.* (citing *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986)).

In deciding whether a settlement proposed by a trustee should be approved, the bankruptcy court should make an informed, independent judgment regarding whether the settlement is fair and equitable and in the best interests of the estate. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968). In making this determination, the court is neither required to conduct an evidentiary hearing, *see Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994), nor is the court required to reach any dispositive conclusions regarding any unsettled legal issues in the case. Thus, it is unnecessary for the bankruptcy court to conclusively determine claims subject to a compromise in deciding whether to approve the compromise, and the court need not have all the information necessary to resolve the factual dispute. *See Comm. of Unsecured Creditors of Interstate Cigar Co., Inc. v. Interstate Cigar Distribution, Inc. (In re Interstate Cigar Co., Inc.)*, 240 B.R. 816, 822 (Bankr. E.D. N.Y. 1999))((in approving a settlement, the bankruptcy court is not required to conduct a "mini-trial on the merits"). Rather, it is the court's responsibility to "canvass the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 497-98 (Bankr. S.D. N.Y. 1991). Central to this determination is a comparison of the terms of the settlement with the probable

13

outcome and cost if the litigation or matter in dispute is not settled. *Trailer Ferry*, 290 U.S. at 424-25. Consequently, factors to be considered when approving a settlement include: (1) the probable success of the litigation on the merits; (2) the possible difficulty in collection of a judgment; (3) the complexity and expense of the litigation; and (4) the interests of creditors. *Kopp v. All American Life Ins. Co. (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020 (B.A.P. 10th Cir. 1997).

While a bankruptcy court may consider the opinions of the parties that a settlement is fair and equitable, the court must ultimately make an independent determination when approving a settlement. *In re Albrecht*, 245 B.R. 666 (B.A.P. 10th Cir. 2000). The movants carry the burden of persuasion to provide the court with sufficient information to conclude that the compromise falls within the reasonable range of litigation possibilities. *Key3media Group, Inc. v. Pulver.com, Inc. (In re Key3Media Group, Inc.*), 336 B.R. 87 (Bankr. D. Del. 2005). While a court generally gives deference to the debtor's and any creditors' committee's business judgment in deciding whether to settle a matter, the debtor has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved. *Id.* (citing *Goodwin v. Mickey Thompason Entm't Group, Inc. (In re Mickey Thompson Entm't Group, Inc.*, 292 B.R. 415, 420 (B.A.P. 9th Cir. 2003). *See In re WorldCom, Inc.*, 347 B.R. 123 (Bankr. S.D. N.Y. 2006). The decision whether to approve a compromise is within the discretion of the bankruptcy court and can only be reversed for abuse of such discretion. *Fischer v. Pereira (In re 47-49 Charles Street, Inc.)*, 209 B.R. 618 (S.D. N.Y. 1997)

With respect to the issue raised concerning a *sub rosa* plan, the applicable law is

14

as follows:    A settlement that has the effect of dictating some of the terms of the debtor's plan of reorganization prior to the confirmation process cannot be approved.  "The debtor and the bankruptcy court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa*. . . ."  *Pension Benefit Guar. Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983).  *See Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 466 (2nd Cir. 2007).  To be found to dictate the terms of a plan, the settlement must either (a) dispose of claims against the estate or (b) restrict the creditors' right to vote.  *Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop., Inc. (In re Cajun Elec. Power Coop., Inc.)*, 119 F.3d 349, 354-55 (5th Cir. 1997).  In addition, the disposition of a significant amount of the debtor's assets pursuant to a Rule 9019 compromise may constitute an impermissible *sub rosa* plan.  *Id.  See Official Comm. of Unsecured Creditors v. Tower Automotive, Inc. (In re Tower Automotive, Inc.)*, 241 F.R.D. 162, 169 (S.D. N.Y. 2006).  Thus, where the debtor proposes to distribute significant estate assets to major classes of creditors on account of prepetition claims or to otherwise dictate the terms of a future plan outside the context of a chapter 11 plan, such proposal violates the policies of chapter 11 and should be denied.  *See Braniff Airways, Inc.*, 700 F.2d at 939-40; *In re Conroe Forge & Mfg. Corp.*, 82 B.R. 781, 784 (Bankr. W.D. Pa. 1988)(absent extraordinary circumstances, "the general rule is that distribution should not occur except pursuant to a confirmed plan of reorganization"); *Official Comm. of Equity Security Holders v. Mabey*, 832 F.2d 299, 302 (4th Cir. 1987)(the appellate court reversed the trial court's approval of an emergency treatment fund for

15

Dalkon shield claimants prior to allowance of claims and prior to plan confirmation, holding that it was a violation of the Bankruptcy Code that could not be justified as an exercise of the court's equitable powers); *State of Ohio Dep't of Taxation v. Swallen's, Inc. (In re Swallen's, Inc.)*, 269 B.R. 634, 637 (B.A.P. 6th Cir. 2001)(reversing the bankruptcy court's approval of pre-confirmation distributions to creditors in the absence of an approved plan, absent a showing of extraordinary circumstances). *See also Matter of Kmart Corp.*, 359 F.3d 866, 871-72 (7th Cir. 2004)(the Bankruptcy Code does not allow the bankruptcy court to authorize full pre-confirmation payment of unsecured debts unless all unsecured creditors in the class are paid in full).

Conclusions of Law

The court's conclusions of law which follow incorporate any of the foregoing findings of fact that might be deemed to be legal conclusions rather than factual findings.

With regard to the *sub rosa* plan issue, as noted, a number of courts have held that a debtor may not distribute significant estate assets outside the context of a Chapter 11 plan. For example, the Braniff Airways case so held. Perhaps a slightly less strict prohibition is the *Conroe-Forge* case ruling that absent extraordinary circumstances, the general rule is that distributions shall not be made except pursuant to a confirmed plan of reorganization.

The proposed Settlement violates both rules. The Debtor proposes to distribute significant estate assets, roughly $24,000,000 out of $80,000,000 in total net assets, to a significant group of unsecured creditors - the Litigation Claimants. Further, there has been no showing of extraordinary circumstances justifying departure from the general rule

prohibiting distribution outside a plan.

Additionally, the Settlement proposes to create a preferred class of unsecured creditors - those who have sued the Debtor - to the detriment of other unsecured creditors without seeking such classification in the context of a plan on which all creditors could vote.

The Settlement also establishes the terms of a plan - another characteristic of a *sub rosa* plan. Lewis testified that the Settlement was fair because the Non-Litigation Participants would receive the same thing under a liquidating plan that would be filed as the Litigation Claimants were receiving under the Settlement.  Thus, the terms of a plan were determined by the Settlement; otherwise, the settlement is not fair. Further, the Settlement disposes of claims against the estate and restricts the creditors right to vote, neither of which is permissible under the holding of the *Cajun Electric Power* case.

Several times during his testimony, Cocks spoke of the Settlement as being a "distribution wrapped in a settlement".  It may more accurately be described as a "plan wrapped in a settlement."  Thus, the Court concludes that the Settlement is an impermissible *sub rosa* plan.

But even if the Settlement were not a *sub rosa* plan, it is not fair and equitable, nor in the best interest of the estate.  As noted, a Settlement must be fair and equitable to all creditors.  But here, the Litigation Claimants get more favorable treatment than Non-Litigation Participants, who are also unsecured creditors. The Litigation Claimants get virtually  the entire cash surrender value of the policies now.  The Non-Litigation Participants do not.  Treatment of the Non-Litigation Participants must await a plan.

Of the $3,000,000 in Settlement repayment, $2.5 million is to adjust for the disproportionate amount of loans against the other policies. That is, the $2.5 million is set

17

aside to keep the Litigation Claimants from getting more than the roughly 29 percent of the value of all the policies. So, in fact, only about $500,000 of the $3,000,000 would be available for the payment of administration expenses in the future, which would be the responsibility of the Non-Litigation Participants.

The estimated future administration expenses are $4.5 to $5 million according to Dr. Lewis, and $6 to $8 million per Mr. Cocks. Since Lewis' estimate came from Committee counsel, and apparently was confirmed by Debtor's counsel, the Court will accept Lewis' estimate.

So in addition to the $500,000 available from the settlement repayment, $500,000 to $600,000 in cash held by the estate could be used to pay administration expenses. That is a total of $1.0 to $1.1 million available to pay a minimum of $4.5 million in administration expenses.

There is also testimony that there is some refundable portion of approximately $1 million paid as attorney retainer fees that could be used to pay administrative expenses. But no one dared to speculate what amount that might be, so the Court is unable to place any value on what amount, if any, from that source could be available for payment of future administration expenses. Then, there is the 20 percent (or some other allocation that the Litigation Claimants and the Millennium Liquidation Trust might agree to) of any settlement that the Litigation Claimants might make with third-party defendants in the litigation now pending. At this point that seems to the Court as "blue sky". So there is no assurance that there will be more than one million or 1.1 million dollars available for the payment of $4.5 to $5 million in administration expenses in the future. Therefore, there is no reasonable expectation that there will be sufficient funds with which to pay anticipated expenses going

18

forward after the Settlement.

There is also the risk that the Settlement would create adverse tax consequences for the Non-Litigation Participants. The Master Plan does not allow for distribution to a participant of the cash surrender value of the policy on his or her life. A participant is entitled to life benefits based on his or her Rating Group, and duration of participation, upon specific triggering events (as the defined in the Plan, including termination of the Plan) and/or death benefit for the participant's beneficiary. It is the very antithesis of the Plan's intent (and the requirement for qualification under section 419 A (f)(6)) - that the policies be pooled for the benefit of all participants - for the Settlement to treat the policies on the lives of Litigation Claimants as if the policies belonged to them individually.

For this reason, it would seem quite plausible that the Settlement would result in the Plan's losing its qualification under 419 A (f)(6), resulting in adverse tax consequences to the Non-Litigation Participants. But the Committee did not see fit to get a written opinion from tax counsel and ERISA counsel on this important issue.

The Court is not persuaded that the issue of whether the Settlement would cause adverse tax problems to Non-Litigation Participants has been satisfactorily resolved. It is the burden of the movants to establish the fairness and equity of the Settlement. Thus, it was incumbent on them to prove that the Settlement was not likely to result in adverse tax consequences to the Non-Litigation Participants. The movants have failed to do so.

As was admitted by Lewis, the risk of the Settlement is on the Non-Litigation Participants. There is the risk that there will not be sufficient funds to pay administration expenses. This is a very high risk. Further, there is the risk that the Settlement will trigger unfavorable tax consequences for the Non-Litigation Participants. This appears to be a

significant risk as well.  Yet, there is no risk at all for the Litigation Claimants.  The disparity of risk demonstrates the unfairness and the inequity of the Settlement with respect to Non-Litigation Participants.

Further, the Court suggests that the influence of the Liquidation Claimants on the Committee outweighed that of the Non-Litigation Participants.  Using the Settlement methodology employed by the Settlement parties, the value of the policies on the lives of the Litigation Claimants was less than 30 percent of the value of all policies.  Yet, four and then five members of the seven member Committee were  Litigation Claimants or counsel for Litigation Claimants.  Dr. Lewis, with the assistance of Committee counsel, negotiated the Settlement with  counsel for a substantial number of the Litigation Claimants.  The Court must conclude that the interests of the Non-Litigation Participants were disproportionately under-represented on the Committee, leading to the possibility that the Settlement favoring the Litigation Claimants was the result of the superior bargaining power of the Litigation Claimants.

A related concern is that in negotiating the Settlement, Dr. Lewis' stated goal was to end the litigation with the Litigation Claimants.  His testimony does not indicate that he gave any consideration to the merit, or lack thereof, of the claims of the Litigation Claimants.  Under all of these circumstances, it should not be a surprise that the result of the settlement negotiations was not in the best interest of all creditors.

For all of these reasons, the court concludes that:

(a)     The proposed settlement is an impermissible *sub rosa* plan of reorganization;

(b)     The proposed settlement is not fair and equitable and is not in the best

20

interest of the estate, and

(c)    The movants have failed to sustain their burden of establishing that the

proposed settlement should be approved.

Accordingly,  the Joint Motion for Approval of Settlement should be, and is hereby

denied.

IT IS SO ORDERED.

J:\ruling.mill.wpd